UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | | |
|---|---|---|
| WILLIE JAMES COOLEY, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-883 |
| | ) | |
| v. | ) | Honorable Richard Alan Enslen |
| | ) | |
| FABIAN LAVIGNE, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of life without parole, imposed by the Kent County Circuit Court on January 7, 1999, after a jury convicted Petitioner of first-degree premeditated murder, MICH. COMP. LAWS 750.316. In his *pro se* petition, Petitioner raises four grounds for relief, as follows:

I.   WHETHER THE EVIDENCE WAS SUFFICIENT ENOUGH TO SUPPORT PREMEDITATION IN THIS FIRST-DEGREE CASE?

II.  WHETHER THE TRIAL COURT'S INSTRUCTION ON INTOXICATION WAS INADEQUATE BECAUSE IT DID NOT GIVE THE FULL APPLICATION THEREOF?

III. WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE INADEQUATE JURY INSTRUCTIONS AND FOR FAILING TO INVESTIGATE AND PURSUE A DEFENSE OF DIMINISHED CAPACITY COUPLED WITH INTOXICATION WHERE THIS WAS THE ONLY DEFENSE?

IV.  WHETHER APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE ISSUES II AND III ON DIRECT APPEAL?

Respondent has filed an answer to the petition (docket #31) stating that the grounds should be denied because they are either procedurally defaulted or lack merit. Upon review and applying the AEDPA standards, I find that all four grounds are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A. Trial Court Proceedings

The state prosecution arose from the fatal stabbing and shooting of 74-year-old Catherine Graves on Monday, May 25, 1998. Petitioner was charged with one count of second-degree murder, and following a preliminary examination on June 10, 1998, he was bound over on a charge of open murder based on two theories: first-degree premeditated murder and first-degree felony murder. Petitioner also was bound over on a charge of possessing a firearm during the commission of a felony. Petitioner was tried before a jury beginning November 16, 1998, and concluding on November 23, 1998.

Petitioner's sister, Rosie Cooley, was the first witness called by the prosecution. Rosie Cooley testified that she was a friend of the deceased, Catherine Graves, and also worked as her care-giver. (Tr. II, 26, 64.) At the time of Graves' death, Rosie Cooley lived with Graves in the house Graves rented. On occasion, Petitioner also stayed with Graves in her home. (Tr. II, 26.) On May 25, 1998, Petitioner came over to Graves' home sometime before noon. (Tr. II, 27.) Petitioner asked Graves to loan him $10, but she refused. Petitioner left the house for a few minutes and returned, this time asking for $20. (Tr. II, 32-33.) Graves told him that her money was to pay her own bills. Petitioner stated something like the following: "Give me the damn money" or "Cathy, God damn it, give me the fucking money." (Tr. II, 33-34.) According to Rosie Cooley, Graves hated

Petitioner's girlfriend, Sharon Renee Ray. (Tr. II, 49.) Graves told Petitioner she was not giving him money "to give that bitch to buy some dope." (Tr. II, 49, 50.) Rosie Cooley then told Petitioner to leave Graves alone and Petitioner told Rosie to mind her own business. (Tr. II, 33-34.)

According to Rosie Cooley, earlier in the week before Graves was killed, Graves told her that she had withdrawn money from the Old Kent Bank the previous Friday in order to pay her bills. (Tr. II, 28, 68, 72.) Petitioner was not present when Graves mentioned to Rosie Cooley that she had money to pay the bills. (Tr. II, 29-30.)

Shortly after Petitioner's demand for money, at approximately 12:00 p.m., Rosie Cooley left Graves' house to go to a Memorial Day party. When she left, Petitioner was at Graves' house. (Tr. II, 27, 35.) She returned that night to find her brother still there, talking with Graves and watching television. (Tr. II, 30.) Rosie Cooley brought a plate for Graves from the holiday picnic, including ribs, potato salad and bread. (Tr. II, 70.) Rosie testified that she had been drinking socially from early afternoon until night. She assumed Petitioner had been drinking, too. (Tr. II, 52.) Graves was drinking when Rosie Cooley returned, but she did not recall if Petitioner was drinking at that time. (Tr. II, 28.) Graves offered Rosie a shot of liquor and a beer. Graves also told Rosie that her friend Michael had called several times wanting the key to get into his house. Graves told Rosie Cooley to take a taxi cab, and Graves gave Rosie $20 from a money roll to purchase alcohol and pay for the cab. (Tr. II, 35-36, 71.) Rosie dropped the keys off and then went to a party store, where she bought alcohol. She was gone less than half an hour. (Tr. II, 38-39.) When she returned, she glanced at Graves lying on the couch and assumed she was sleeping. Rosie set the money and the liquor on the coffee table and went directly to the bathroom. (Tr. II, 39.) When she came back, she realized that Graves was not responding to her remarks. Rosie looked over at the couch and saw

blood all over Graves.  (Tr. II, 40.)  Rosie testified that she touched nothing except the telephone to call 911.  (Tr. II, 44.)  She reported that Graves always wore a gold watch and a large round diamond ring on her finger.  Rosie Cooley knew Graves was wearing both that day, because Rosie had given Graves a bath that morning.  (Tr. II, 46.)  The watch was missing when Rosie Cooley discovered Graves' body.  (Tr. II, 45-46.)  Graves also kept a flowered wallet under the couch; Rosie Cooley never saw it again after she returned.  (Tr. II, 46.)  Further, Graves kept a silver-barreled .38 caliber pistol and a shotgun in the home.  The pistol was kept under the sofa or behind the doors of the coffee table.  (Tr. II, 47, 48.)  Graves had guns for protection, in case of a break-in.  (Tr. II, 65.)  Rosie Cooley did not ever see her pull her gun on anyone.  (Tr. II, 65.)

On cross-examination, Rosie testified that she called Graves "Granny," while Petitioner called her "Ms. Cat" or "Kitty Cat."  (Tr. II, 52-53.)  Petitioner also was good friends with Graves, though all of them would bicker at times.  (Tr. II, 53.)  Rosie testified that Petitioner loved Graves and that she never imagined that he would hurt her.  (Tr. II, 53-54.)   All of them drank together regularly.  (Tr. II, 54.)  Graves also sold drinks to others when they would come by, as a means of earning extra income.  (Tr. II, 54-55.)

Grand Rapids Police Officer Gretchen Galloway testified that she was the first police officer on the scene, arriving shortly after the 911 call at 11:34 p.m.  (Tr. II, 75.)  According to Galloway, Rosie Cooley was extremely upset when the police arrived, but Galloway calmed her down.  Rosie then answered Galloway's questions.  Galloway could smell alcohol on Rosie Cooley, who admitted she had been drinking all day, though she did not appear to be visibly intoxicated.  (Tr. II, 77-78.)

Bridget Bracken, a Grand Rapids Police Department crime scene technician, assisted the senior technician, Dean Garrison, in searching the living room of Graves' house. (Tr. II, 79-80.) Bracken testified that the doors of the coffee table were open, but no gun was inside. Similarly, no shotgun was recovered from behind the couch. Further, the officers did not locate a flowered purse belonging to the victim. They did find a spent shell underneath the cushion of the couch, below the victim. (Tr. II, 81-83.) They also examined a purse belonging to Rosie Cooley, which contained an insignificant but undetermined amount of cash. (Tr. II, 83-84.)

Grand Rapids Police Officer Matthew Ostapowicz testified that he and the partner he was training, Matt Dwyer, were directed by Sergeant Postma to canvas the neighborhood. They were approached by Miller Griffin, who came running up to them and said that he had spoken to "Renee," who allegedly told him that Petitioner was at her house and had blood all over him. (Tr. II, 94.) At approximately midnight, the officers, accompanied by Griffin, went to the indicated house in an attempt to locate Petitioner. (Tr. II, 94, 97.) They searched the house and, after interviewing those present, went to Petitioner's wife's home. They knocked on the door and listened, believing they heard both a man's and a woman's voice. While they were standing on the porch, the officers noticed a man who appeared to bump into a car while walking past the house. (Tr. II, 97-99.) Moments later, Sergeant Johnson drove around the corner and parked his vehicle outside. He spoke with the man, who identified himself as the man for whom they were looking, the Petitioner in this case. Petitioner then was placed under arrest. (Tr. II, 101-02.) Ostapowicz testified that he was not close enough to form an opinion as to whether Petitioner was intoxicated. (Tr. II, 104-06.) Officer Matthew Dwyer also testified that he was too far away to determine whether Petitioner was intoxicated. (Tr. II, 115-16.)

Grand Rapids Police Crime Scene Technician Dean Garrison testified that he participated in a search of the victim's home in the late-night hours of May 25, 1998.  (Tr. III, 4-5.) He recovered a knife with a six-inch blade from the sink in the kitchen.  (Tr. III, 7-8.)  He also located a .22 caliber casing beneath the pillow behind the victim and a .22 caliber rifle on the back porch.  (Tr. III, 9.)  He found no flowered purse.  (Tr. III, 10.)

Sharon ("Renee") Ray testified that she was Petitioner's girlfriend.  She knew the victim, Catherine Graves, but they did not get along.  (Tr. III, 12, 14-15.)  She lived in the next street from Graves.  (Tr. III, 13.)  On the day of the killing, Ray went to Graves' house for the first time at approximately 4:30 p.m. to let Petitioner know that she had returned home.  (Tr. III, 14.)  She asked Petitioner for money to buy Pampers, and he gave her $20.  (Tr. III, 25.)  She returned to Graves' house sometime later, after Petitioner called her to pick up her baby, who had been at Graves' home with Petitioner.  She did not go inside the house.  (Tr. III, 14-15.)  She spoke with Petitioner, but she did not see either Rosie Cooley or the victim.  (Tr. III, 15.)  Sometime between 10:30 and 11:30 p.m., Petitioner came to Ray's house.  She saw Petitioner standing outside between her driveway and that of her neighbor.  She saw him throw something.  (Tr. III, 16.)  Shortly thereafter, Petitioner came to her screen door and knocked.  He came into the house and she noticed that his clothing had blood smeared across the shirt and pants' pocket.  (Tr. III, 17-18.)  She panicked and asked what happened, assuming he had injured himself because he was unable to see at night. (Tr. III, 18.)  Petitioner told her that he had gotten into a fight with some dope dealers at the corner. (Tr. III, 19.)  Ray asked Petitioner for some money to buy some cigarettes.  He gave her three dollars, and she saw that he had more money with him.  (Tr. III, 20.)  She went to a friend's house to pick up cigarettes her friend had purchased for her.  (Tr. III, 20.)  She never got the cigarettes because she

heard sirens and returned to her house. She asked him again what had happened, and he told her he had been cut. But she could not find a cut. He then told her that he and Graves had gotten into a fight, that Graves had shot at him, and that he had stabbed her. (Tr. III, 21-22.) Ray looked out the back door and saw the police lights in the area near Graves' house, and she told him to leave. (Tr. III, 22-23.) Ray denied knowing Miller Griffin by name and denied telling anyone about seeing Petitioner that night. (Tr. III, 24.) The police came to her house after Petitioner was gone and searched it. (Tr. III, 24.)

Rosie Cooley's daughter, Deborah Cooley, testified that she went to Graves' house to retrieve her mother's purse at approximately 7:30 on the morning of May 26, 1998. (Tr. III, 28.) She did not see her mother's purse, but found Graves' black leather purse. (Tr. III, 28.) She opened the purse, but she found no wallet. She took the purse with her and gave it to Graves' cousin, Mary Scott. (Tr. III, 29.) Deborah Cooley did not know if Graves used a flowered wallet, but she did not see one. She also did not see Graves' gold watch. (Tr. III, 29-30.)

Grand Rapids Police Sergeant Vincent Reilly was called to Petitioner's wife's house at 12:16 a.m. on May 26, 1998. He and Officer Ostapowicz went to the side of the house to knock on the door. While they were knocking, he heard a commotion on the street, with Sergeant Johnson yelling at Petitioner to get down on the ground. Reilly went over and handcuffed Petitioner. (Tr. III, 33.) Reilly did not notice that Petitioner's clothes were bloody. (Tr. III, 34.) Reilly observed no signs that Petitioner was intoxicated. (Tr. III, 35) Petitioner did not smell of alcohol and did not complain of any pain, though he appeared distraught. (Tr. III, 35-36.) Reilly transported Petitioner to police headquarters, where he was interviewed by detectives. (Tr. III, 36.)

Dr. Stephen Cohle was accepted as an expert in forensic pathology. (Tr. III, 49.) Dr. Cohle described the wounds he found in conducting the autopsy of Catherine Graves. He reported that Graves had two fresh abrasions in the area of the solar plexus. She also had a gunshot wound from a bullet that entered through the left eye. Based on soot deposits, was shot was fired while the gun was in contact or near contact with the eye. (Tr. III, 52-53.) The .22 caliber bullet passed through the eye tissue, through the right frontal lobe, and exited through the right temporal area. (Tr. III, 53-54.) In Dr. Cohle's opinion, the gunshot would have been fatal to the victim within two to four minutes, and she would have been unconscious immediately after having been shot. (Tr. III, 55.) Dr. Cohle found seven stab wounds, which are sharp force injuries, deeper than they are long, which are thrust into the body with a pointed sharp object. (Tr. III, 55-56.) He also found numerous incised wounds, which are wounds that are generally longer than they are deep, made by drawing a sharp blade across the skin. (Tr. III, 56.) The knife wounds were made by a single-edged knife. (Tr. III, 56.) Graves received stab wounds to the chest, penetrating 2.5 inches into the lung and 5.5 inches into the chest cavity. Another stab wound was made to the upper abdomen, penetrating 5.5 inches through a rib and into the right lung. (Tr. III, 59-60.) Graves also received a 5-inch-deep stab wound to the solar plexus, which pierced the right lobe of the liver. (Tr. III, 60.) Graves also received stab wounds to both the right and left forearms. (Tr. III, 61-62.) With medical treatment, Graves probably would have survived all of these stab wounds. (Tr. III, 60, 61.)

According to Dr. Cohle, the victim also had a number of incised wounds. The first was to the palm of the left hand. Both the stab wounds to the forearms and the incised wound to the palm were characteristic of defense wounds. (Tr. III, 62-63.) Graves also had two incised wounds to her neck. The one on the right side traveled from left to right in a downward direction and was

two inches long and one inch deep.  The one on the left was nearly parallel, but was five inches long and quite deep into the tissues.  The neck cuts severed both the right carotid artery and the right subclavian artery and nearly severed the trachea.  These wounds were fatal.  (Tr. III, 63-64.)  A person inflicting these cuts would have been required to use nearly his entire strength to penetrate the neck structures of skin, fatty tissue and muscle, as the arteries involved are very deep within the neck structures.  Similarly, the trachea is a durable structure requiring a great deal of force to penetrate.  (Tr. III, 64-65.)  The knife wounds were most likely inflicted before the gunshot wound. (Tr. III, 66.)  According to blood and eye fluid tests, the victim had been drinking for a substantial period of time and had an alcohol content of .25 percent.  (Tr. III, 67, 69.)

Police Detective Michael Duke testified that he was the lead detective on the investigation.  (Tr. III, 40.)  Duke interviewed Petitioner on May 26 and again on May 27, 1998.  (Tr. III, 40-41.)  Petitioner was advised of his rights and he agreed to make a statement.  (Tr. III, 42.)  The prosecution played the taped statement made by Petitioner to police.  (Tr. III, 45.)  Petitioner initially denied involvement in the crime.  Subsequently, after the detectives asked Petitioner about self-defense, Petitioner acknowledged that he had fought with Graves after she pulled a gun and fired at him.  (Tr. III, 75-76.)  Duke testified that an examination of the scene showed no second bullet casing or bullet hole.  (Tr. III, 76.)  Petitioner initially claimed that he threw the gun as he left the house.  He subsequently acknowledged that he may have thrown it between the driveway by Sharon Ray's house.  (Tr. III, 77.)  Finally, he stated that he had gone to a third location and thrown it on the roof of a house.  The gun was not recovered.  (Tr. III, 77.)  Duke testified that, at the time of the first interview at 3:12 a.m., Petitioner told him he was not drunk, though Duke could smell some alcohol on Petitioner.  (Tr. III, 81.)  Duke had no information regarding Petitioner's degree of intoxication

at 11:00 p.m. the evening before.  (Tr. III, 81.)  Duke testified that, according to the subpoenaed bank records of Graves' account, the last withdrawal from the account was made on April 10, 1998.  (Tr. III, 82.)  At the time of his booking, Petitioner had $210 in his possession.  (Tr. IV, 5.)  The prosecution rested.  (Tr. IV, 7.)

Petitioner was the sole witness for the defense.  He testified that he had known Graves as a friend of his sister Rosie since he first came to Grand Rapids from Mississippi in 1979.  He moved back to Mississippi in 1981, and, after he returned to Grand Rapids in 1987, he lived with Graves until 1988.  (Tr. IV, 9-11.)  In 1989, he moved back in with her and he began to know her better.  They began drinking together more and more frequently.  (Tr. IV, 12.)  They became very close, to the point Graves began calling him her son.  (Tr. IV, 13.)  Petitioner testified that, while he admitted killing Graves, he never intended to do so and he never stole from her.  (Tr. IV, 14.)  Petitioner drank all day with Graves on Saturday, May 23, 1998.  He returned on Sunday, May 24, 1998, at approximately 8:00 or 9:00 a.m., when he began drinking again.  He bought his drinks from Graves, as she rarely gave alcohol away.  (Tr. IV, 17.)  Petitioner testified that the first time he saw his sister Rosie that weekend was Monday morning.  (Tr. IV, 18.)  Rosie returned again after dark that evening.  (Tr. IV, 18.)  Petitioner was present when Graves asked Rosie to buy more liquor.  (Tr. IV, 18.)  Petitioner testified that Renee Ray had come over because he had their baby with him.  Ray asked for money to buy diapers and he gave her some money that evening.  (Tr. IV, 19.)  Petitioner testified that he had $260 on him that day, saved from his social security check and his employment at Food Town.  (Tr. IV, 19.)  He later gave Ray some money for cigarettes.  (Tr. IV, 20.)  Petitioner denied asking Graves for money that day, as he was not in need of any.  (Tr. IV, 20.)  He did not know why his sister would say he had asked for money.  He testified, however, that Rosie frequently

drank heavily and had a tendency to forget.  Petitioner also testified that Rosie disliked Renee Ray because Graves disliked Ray.  (Tr. IV, 22.)

           Prior to May 25, 1998, Petitioner had never been threatened by Graves.  However, he had seen her waive her gun around the house and had seen her pull it out when Ray was present.  (Tr. IV, 23-24.)  On the day of Graves' death, Renee Ray called several times before coming over, wanting Petitioner to come over to her house.  Graves pulled the gun out and placed it on the table the third time Ray called.  (Tr. IV, 24-25.)  Graves discouraged Petitioner from leaving and he continued to drink with her.  (Tr. IV, 25-26.)  The last time Ray called, Graves answered, saying, "Bitch, I told you quit calling to my damn house."  (Tr. IV, 27.)  Graves then argued with Petitioner, insisting that he get Ray to quit calling her house.  (Tr. IV, 27.)  Graves told Petitioner that if he could not control Ray she would prefer him to stay away from her house.  (Tr. IV, 27.)  Petitioner repeatedly responded that he had nothing to do with the dispute between Graves and Ray, and he did not want Graves taking her problems with Ray out on him.  (Tr. IV, 28.)  Graves and Petitioner continued to drink and to argue for the next few minutes.  Petitioner called Graves an "old senile ass bitch," at which time Graves threw whiskey in his face.  (Tr. IV, 29.)  He slapped her in the face.  (Tr. IV, 29, 31.)  Petitioner turned toward the television to get his drink, and Graves pulled the gun out and placed it on the table.  Petitioner told Graves to put the gun away before someone got hurt, but Graves left it out.  (Tr. IV, 32.)  When Petitioner was preparing to drink his whiskey and relax in his chair, Graves pulled the gun in his face.  (Tr. IV, 33.)  He saw her work the trigger, but no shot was fired.  Graves said, "Oh, shit," and Petitioner got up and grabbed her by her wrist, insisting she put the gun down.  Graves was hollering and began hitting Petitioner.  He pushed her on the couch, while falling himself.  Graves hit him over the head two or three times with a half-full, plastic, half-

- 11 -

gallon whiskey bottle.  (Tr. IV, 36-37.)  Graves then kicked him into the table.  Petitioner testified

that, at that point, he lost control and picked up the knife Graves kept on the table.  (Tr. IV, 37-38.)

He testified that he intended to stop Graves from hurting him, but he neither intended to hurt her nor

to kill her.  (Tr. Iv, 38.)  Petitioner claimed that he had been drinking a lot that day and that, because

he drinks a great deal, people usually do not know if he is drunk, except that they can smell the

alcohol on him.  (Tr. IV, 39.)  After swinging the knife around repeatedly, he could see what he had

done and he could not stand to look.  He removed the gun from Graves' hand, intending to put it

away, but he stumbled and fell and the gun went off.  (Tr. IV, 40.)  He picked up the knife from the

floor and took it to the kitchen.  He tried to wash his hands, but he heard something moving in the

back yard and he ran out of the house and slammed the door.  (Tr. IV, 41.)  He left the knife in the

sink and threw the gun at the corner of Watkins and Kalamazoo.  (Tr. IV, 41.)  When he left, he

knew Graves was badly hurt, but he did not know she was dead.  (Tr. IV, 42.)  He ran down the alley

toward Ray's house, but he slipped and fell on the hill.  (Tr. IV, 42.)  He got up and went to Ray's

house.  He later continued to his wife's house.  (Tr. IV, 43.)  He acknowledged that he had stumbled

into a car, as the police officers testified.  Petitioner stated that he fell into the car as he left the curb

because he had been drinking too much.  (Tr. IV, 43.)

On cross-examination, Petitioner testified that he had lived with Graves most recently

in 1997.  (Tr. IV, 44.)  However, he continued to use Graves' address as his mailing address.  (Tr.

IV, 45.)  Petitioner testified that Graves wanted him to get a permanent place to live and that he

planned to use most of the money he had on a deposit on an apartment he was supposed to get on

the following Tuesday.  (Tr. IV, 49.)  Petitioner receives social security disability due to his blood

disease, retinal pigmentosa, which affects his ability to see at night.  (Tr. IV, 51.)  He testified that

he was drunk at the time he gave his statement to police.  (Tr. IV, 51-52.)  He acknowledged, however, that he had told police that he was not drunk.  He explained that, as an alcoholic, he did not usually admit being drunk.  (Tr. IV, 53.)  Petitioner also acknowledged that, in normal night conditions, he was unable to see.  (Tr. IV, 54.)  Petitioner testified that he did not throw anything down outside Ray's house, but merely made a gesture of frustration.  (Tr. IV, 78.)  Petitioner acknowledged that he had lied to police at the time he made his first statement.  (Tr. IV, 81, 87-88.)

On redirect, Petitioner stated that the bickering with Graves that his sister overheard was not about an attempt to borrow money from Graves, but was about her demand that he repay money he had owed her for some time.  (Tr. IV, 91.)  The defense rested and the prosecution introduced no rebuttal evidence.  (Tr. IV, 94.)

At the conclusion of trial, on November 23, 1998, the jury found Petitioner guilty of first-degree premeditated murder.  (Tr. V, 3)  On January 7, 1999, Petitioner was sentenced to serve a term of life without parole.  (Cir. Ct. Docket Sheet, docket #17.)

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on September 7, 1999, raised two issues:  (1) insufficient evidence to demonstrate premeditation and deliberation; and (2) ineffective assistance of trial counsel in developing the intoxication defense.  (See Def.-Appellant's Br. on Appeal, docket #25.)  Petitioner filed a motion to remand, which was denied by the Michigan Court of Appeals on November 24, 1999.  (See 11/24/99 Mich. Ct. App. Ord, docket #25.)  By unpublished opinion issued on May 19, 2000, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 5/19/00 Mich. Ct. App. Opinion ("MCOA Op."), docket #25.)

Petitioner, through counsel, filed an application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals. By order entered December 27, 2000, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #26.)

### C. Post-conviction relief

On July 5, 2001, Petitioner filed a pro per motion for relief from judgment in the Kent County Circuit Court. He raised four issues: (1) the court failed adequately to instruct the jury on voluntary intoxication; (2) he was denied ineffective assistance of trial counsel when counsel failed to investigate and prepare a diminished capacity defense and failed to object to the inadequate intoxication instruction; (3) ineffective assistance of appellate counsel; and (4) cause and prejudice for the failure to raise the issues on direct appeal. The trial court denied the motion on December 11, 2001. (Cir. Ct. Op., docket #27.) Petitioner sought leave to appeal to both the Michigan Court of Appeals and the Michigan Supreme Court. Petitioner also filed a motion to remand to the trial court for an evidentiary hearing on the effectiveness of counsel. On March 20, 2003, the Michigan Court of Appeals denied both the motion to remand and the application for leave to appeal on the grounds that Petitioner had failed to meet the burden of demonstrating entitlement to relief under MICH. CT. R. 6.508(D). (3/20/03 MCOA Ord., docket #27.) On the same grounds, the Michigan Supreme Court denied both the motion to remand and the application for leave to appeal on September 29, 2003. (9/29/03 Mich. Ord., docket # 28.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA").  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

- 15 -

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

- 16 -

**Discussion**

I.   Insufficient Evidence of Premeditation

In his first ground for habeas relief, Petitioner contends that the state presented insufficient evidence of premeditation to support a conviction for first-degree murder.  A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*   Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Petitioner does not dispute that he killed Graves.  He argues, however, that strong evidence indicated that he was intoxicated and that he was responding to Graves' own physical attack.  He therefore argues that the evidence was insufficient to demonstrate premeditation or deliberation.

The Michigan Court of Appeals, after setting forth the applicable legal standard and the elements of first-degree murder, analyzed Petitioner's claim as follows:

The Michigan Supreme Court has noted that intoxication can be a defense to first-degree murder "if the facts of the case could allow the jury to conclude that the defendant's intoxication was so great that the defendant was unable to form the necessary intent." *People v Mills*, 450 Mich 61, 82; 537 NW2d 909 (1995). If a defendant's intoxication negated his ability to premeditate, then the defendant would be guilty of second-degree murder. See *People v Langworthy*, 416 Mich 630, 651; 331 NW2d 171 (1982).

Cooley does not deny that he killed Graves; however, he argues that there was insufficient evidence to allow the jury to conclude that he had formed the intent to kill her in advance of the killing. The Michigan Supreme Court has noted that "[i]t is the province of the jury to determine questions of fact and assess the credibility of witnesses." *People v Lemmon*, 456 Mich 625, 637; 576 NW2d 129 (1998). In the present case, the prosecutor demonstrated that Cooley did not act in self-defense and was sufficiently sober to premeditate killing Graves. For example, the jurors heard several police officers testify that Cooley did not appear to be intoxicated, that he obeyed orders when he was arrested, and that he lied during his May 26, 1998, interrogation. Further, the jurors heard Cooley testify that he lied to his girlfriend, Sharon "Renee" Ray, shortly after murdering Graves by telling Ray that he had been in a fight with drug dealers. Rosie Cooley, Cooley's sister, testified that on the day of Graves' murder, she heard Cooley tell Graves "Cathy, God damn it, give me the f-----g money" when Graves refused to give Cooley $20, which could be construed as evidence of both motive and premeditation. Although Cooley claimed that he accidentally shot Graves, it is undisputed that he used two separate weapons, a knife and gun, to kill her, which tends to show that Cooley engaged in some thinking about the murder. *People v Haywood*, 209 Mich App 217, 230; 530 NW2d 497 (1995).

Notably, the trial testimony revealed that Cooley stabbed Graves seven times and shot her point-blank in her left eye. Further, the medical examiner noted that two of the knife wounds were characteristic of defense wounds, suggesting that Graves attempted to prevent her assailant from stabbing her. See *Anderson*, *supra* at 538. The medical examiner also noted that one of the knife wounds on Graves' neck "would take an adult person using virtually all of his or her strength to draw the knife across the neck." Also, Cooley admitted at trial that he washed his hands after the murder and went to his wife's house in order to change his bloodied clothes. See *Haywood*, *supra* at 230 ("evidence of defendant's attempt to clean up the blood after the killing could be used to infer that he acted with deliberation and premeditation").

As the final judge of credibility, see *Lemmon*, *supra* at 637, the jury here chose to believe the prosecution's witnesses, as evidenced by its guilty verdict. Clearly, based on the direct and circumstantial evidence viewed in a light most favorable to the prosecution, a jury could find beyond a reasonable doubt that Cooley committed first-degree premeditated murder. *Kelly*, *supra* at 642. We will not

interfere with the jury's decision to discredit Cooley's self-defense and intoxication defenses. *Wolfe*, *supra* at 514.

(MCOA Op. at 2-3.)

The state court's determination was patently reasonable. Ample evidence was presented which, if believed, would support the jury's finding of premeditation and deliberation. In particular, the nature of the wounds, the use of multiple weapons, the testimony that the parties had argued earlier in the day, and the fact that Petitioner washed his hands and the knife all support the jury's conclusion that Petitioner was not operating in self-defense and that the killing was performed with premeditation and deliberation. Accordingly, Petitioner's first habeas ground is without merit.

II.     Adequacy of Instruction

In his second habeas ground, Petitioner asserts that the trial court's instruction on intoxication was inadequate, was clearly erroneous under state law, and deprived him of his rights under the Fifth and Sixth Amendments. Specifically, he argues that the trial court did not use the standard jury instruction on intoxication and therefore deprived him of a substantial defense.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, to state a claim under the Fifth Amendment, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same). If Petitioner fails to meet this burden, he fails to show that the jury instructions violated his right to due process under the Fifth Amendment. *Id.* Morevoer, to

- 19 -

demonstrate entitlement to relief under the Sixth Amendment, Petitioner must show that he was

denied an instruction on a defense for which he presented evidence. *Mathews v. United States*, 485

U.S. 58 (1988).

> The trial court gave the jury the following instruction on voluntary intoxication:

> > There has been considerable testimony about drinking in this case. Voluntary
> > intoxication or drunkenness, is not an excuse for criminal conduct except within very
> > limited circumstances. If a crime involves a specific intent, it may have some
> > bearing. Specific intent in this case involves the crime of first degree premeditated
> > murder. First degree premeditated murder requires premeditation and deliberation,
> > both of which require specific intents. Felony murder has an element there must be
> > a larceny. Larceny requires a specific intent to deprive the owner of property
> > permanently. If you find that Mr. Cooley's mind was so clouded by alcohol that he
> > could not actually form such intents, then intoxication is a valid defense to those
> > specific elements of those crimes.

(Tr. IV, 149-150.)

> Petitioner raised this issue for the first time in his motion for relief from judgment.

The trial court, the Michigan Court of Appeals and the Michigan Supreme Court all denied relief on

the grounds that Petitioner had failed to meet the requirements of demonstrating entitlement to relief

under MICH. CT. R. 6.508(D). As a consequence, Petitioner's claim is procedurally defaulted.

> When a state-law default prevents further state consideration of a federal issue, the

federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst*

*v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine

whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider

whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state

court rendering judgment on the claim at issue actually enforced the state procedural rule so as to

bar that claim; and (3) the state procedural default is an "independent and adequate" state ground

properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 551-52; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

Under MICH. CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." M.C.R. 6.508(D)(3)(a)-(b). In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence. *Luberda v. Trippett*, 211 F.3d 1004, 1006-1007 (6th Cir. 2000). Because M.C.R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, M.C.R.

6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action.  *See Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998).

As cause excusing his default, Petitioner raised the claim of ineffective assistance of trial counsel.  To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).  Petitioner raised his claim of ineffective assistance of counsel in his motion for relief from judgment and in all levels of appellate review; thus, the claim was exhausted.  However, because the claim was rejected by the Michigan Supreme Court's application of M.C.R. 6.508(D), the claim is also procedurally defaulted.  Therefore, for Petitioner to use the claim of ineffective assistance of appellate counsel as "cause," he must first meet the "cause" and "prejudice" standard for the claim of ineffective assistance of appellate counsel itself.  *See Edwards*, 529 U.S. at 453; *Coleman*, 244 F.3d at 538; *Lancaster*, 324 F.3d at 436-37; *Clifford v.Chandler*, No. 01-5926, slip op. at 6 (6th Cir. June 25, 2003).  Where a petitioner has argued cause based on ineffective assistance of appellate counsel, and where he argued ineffective assistance of both counsel for the first time in his motion for relief from judgment, the Sixth Circuit has found cause and prejudice excusing state courts' denial of postconviction relief under MICH. CT. R. 6.508(D).  *See Munson v. Kapture*, 384 F.3d 310, 315 n.2 (6th Cir. 2004) (observing that claim of ineffective assistance of appellate counsel "arguably could not have been raised on direct appeal" and therefore could not properly be considered defaulted under MICH. CT. R. 6.508(D)); *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004).

As a result, in order to analyze whether Petitioner's procedural default should be excused, the Court would be required to determine whether both trial and appellate counsel were

- 22 -

ineffective in failing to address the claim.  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999). Accordingly, the Court will address the merits of the claim.

Petitioner does not explain how this instruction failed to comport with Michigan law or how it deprived him of a fundamentally fair trial.  Instead, he simply argues that some evidence showed that both he and Graves had been drinking all day and that the drinking prevented him from having the requisite specific intent to commit first-degree murder.  The trial court, in rejecting Petitioner's claim, held as follows:

> As defendant Cooley admits, the court did instruct on voluntary intoxication and advised the jury of its effect on the specific intent necessary to prove the elements of premeditation and deliberation involved in First Degree Premeditated Murder and the specific intent to deprive an owner of property which was involved in the larceny element of Felony Murder.  The Court of Appeals in its Opinion addressed at length issues raised by defendant's intoxication defense.  Defendant has had a full opportunity to present the issue of the adequacy of the jury instructions on the subject of voluntary intoxication and chose not to do so and is thus barred unless good cause is shown for the failure to raise the issue as well as prejudice in the result. . . .

(11/12/01 Cir. Ct. Ord., at 3.)  The determination of the trial court was entirely reasonable.  Petitioner testified that he was intoxicated, that he was defending himself, and that he never planned or intended to kill Graves.  Defense counsel also argued that he was too intoxicated to form the requisite intent.  The trial court properly instructed the jury that it was permitted find that Petitioner was sufficiently intoxicated to prevent him forming the requisite specific intent required for first-degree murder.  Although the trial court's instruction was not identical to then-existing MICH.

STAND. JURY INST. 2D 6:1:02,[1] the instruction given was substantially in accord with that standard jury instruction. Even under Michigan law, the trial court is not required to use the standard jury instructions, as long as the instruction used "fairly presented the issues to be tried and sufficiently protected the defendant's rights. *People v. Daniel*, 523 N.W.2d 830, 835 (Mich. Ct. App. 1994). The instruction, as given, both fairly presented the defense and sufficiently protected Petitioner's rights. As a result, Petitioner fails to demonstrate any error in the trial court's instruction, much less to demonstrate that he was unconstitutionally deprived of a fundamentally fair trial or of an instruction regarding a defense for which he introduced evidence. I therefore recommend that Petitioner's second ground for habeas relief be denied.

III.    Ineffective Assistance of Trial Counsel

Petitioner next argues that his trial counsel was ineffective because he failed to investigate and prepare a "diminished capacity defense" and failed to object to the trial court's inadequate voluntary intoxication instruction. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

---

[1] Since the time Petitioner committed and was tried for his offense, Michigan law has changed. Voluntary intoxication no longer is a defense to any crime, even crimes of specific intent. *See* MICH. COMP. LAWS § 768.37 (eff. Sept. 1, 2002). The standard jury instruction governing intoxication was changed in October 2002 to comport with the change in the law, and it is now found at MICH. STAND. JURY INST. 2D 6:1:02.

assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

Petitioner makes two arguments.  First, he argues that counsel was ineffective for failing to object to the jury instruction on voluntary intoxication.  This claim was raised for the first time in Petitioner's motion for relief from judgment.  As I previously observed, because the state courts rejected the claim on the grounds that Petitioner had failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D), the claim is procedurally defaulted.  However, assuming Petitioner could show cause and prejudice excusing his default, Petitioner's first claim of ineffective counsel is meritless.  The Court previously has concluded that the trial court's instruction on voluntary intoxication did not violate Petitioner's Fifth or Sixth Amendment rights.  As a consequence, Petitioner cannot demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Second, Petitioner claims that counsel failed to adequately investigate a "diminished capacity defense." Petitioner makes a variety of particularized assertions: (1) counsel failed to interview two witnesses who were aware of his intoxicated state on the day of the murder; (2) counsel failed to file the notice required under MICH. COMP. LAWS 768.20a governing notice of the intent to present an insanity defense; (3) counsel failed to seek a criminal responsibility evaluation; and (4) counsel did not move for the appointment of an expert in toxicology.

It is well-established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). It also includes the duty to investigate mitigating evidence. *See Wiggins v. Smith*, 539 U.S. 510, 524-29 (2003). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); accord *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004). A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

On direct appeal, Petitioner argued only that counsel had failed to interview the witnesses to his intoxication. The Michigan Court of Appeals rejected that claim as follows:

> Cooley claims that defense counsel failed to interview [Linda] Harris and Lossie Cooley, who is his niece and Rosie Cooley's daughter, regarding his intoxication defense. The failure to interview witnesses does not, itself, constitute deficient performance. *People v Caballero*, 184 Mich App 636, 642; 459 NW2d 80 (1990). Cooley has failed to show his attorney's failure to interview these witnesses "resulted in counsel's ignorance of valuable evidence which would have substantially benefited the accused." *Id.* Moreover, the trial transcript reveals that defense counsel adequately supported Cooley's intoxication defense by attempting to present evidence that Cooley had been drinking all day on the day of Graves' murder. Therefore, Cooley cannot demonstrate that defense counsel's performance was deficient. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995).
>
> Even assuming that defense counsel's failure to interview various witnesses constitutes deficient performance, Cooley cannot establish "a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." *People v Johnnie Johnson*, 451 Mich 115, 124; 545 NW2d 637 (1996). The trial record is devoid of any proof that Cooley advised defense counsel of Harris and Lossie Cooley's potential testimony. Cooley never even mentioned Harris or Lossie Cooley in his trial testimony. As a result, the record is silent regarding what Harris and Lossie Cooly in fact would have testified to regarding Cooley's intoxication defense. Thus, Cooley has not demonstrated that a reasonable probability exists that, if counsel had interviewed and called Harris and Lossie Cooley as witnesses, the outcome of the proceedings would have been different. See *Pickens, supra* at 312.

(MCOA Op. at 4-5.)

The court of appeals' determination constitutes a reasonable application of clearly established Supreme Court precedent. Lossie Cooley and Linda Harris presented affidavits to the state courts to the limited effect that they saw Petitioner sometime after Graves was killed and he was stumbling drunk. They averred that Petitioner was stumbling drunk. Assuming counsel was aware of their potential testimony at the time, as Petitioner claims he was,[2] Petitioner has presented

---

[2] I noted, however, as the state court observed, although Petitioner testified at trial that he was drunk, he did not mention having seen Harris or Lossie Cooley after he left Graves' house. The Michigan Court of Appeals strongly implied that the belatedly proffered affidavits of family members were not credible.

no evidence that an interview of the witnesses would have produced any new information. Moreover, on the basis of the information he possessed, counsel acted reasonably in failing to call the two as witnesses.  Both Linda Harris and Lossie Cooley are related to Petitioner: Harris is Petitioner's sister and Lossie Cooley is his niece.  A reasonable attorney could well have concluded that Harris and Lossie Cooley both would appear to be biased witnesses who could undermine Petitioner's own credibility.  Petitioner therefore fails to overcome the presumption that counsel's decision not to call the two witnesses constituted sound trial strategy.  *Strickland*, 466 U.S. at 689-90.

In his habeas claim, Petitioner also asserts that a counsel should have moved for a criminal responsibility examination and an expert witness on toxicology.  Both, he asserts, would have permitted him to present a "diminished capacity" defense.  Petitioner presented this claim for the first time in his motion for relief from judgment.  The Michigan courts all rejected the claim ont he ground that Petitioner had failed to demonstrate entitlement to relief pursuant to MICH. CT. R. 6.508(D).[3]  In reaching its decision to deny relief, the Kent County Circuit Court noted that Petitioner had raised a claim concerning his intoxication and the impact on his judgment at the time of his appeal, yet he had failed to raise the new portion of his claim at the time.  The court also concluded that Petitioner's assertions were without support in the record and were legally irrelevant:

> Defendant Cooley does not understand, apparently, that voluntary intoxication <u>is</u> a diminished capacity defense. See *Michigan Criminal Law and Procedure*, 2nd Ed § 42.55, page 2.156.  It asserts that because of the diminished capacity brought

---

[3] For purposes of this report and recommendation, I again will assume that Petitioner could demonstrate cause and prejudice excusing his procedural default.  *See Rogers*, 144 F.3d at 994 (where state courts have rejected a motion for relief from judgment on the grounds that defendant had failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D), claim is procedurally defaulted and petitioner must demonstrate cause and prejudice excusing the default).

on by the voluntary ingestion of alcohol a defendant was incapable of forming the specific intent which is necessary for the commission of the particular crime. . . .

(12/11/01 Cir. Ct. Op. at 3-4; docket #27.)

The court's rejection of Petitioner's independent diminished capacity defense was reasonable.  To the extent Petitioner suggests that Michigan law permits the use of a diminished capacity defense other than the instruction on specific intent, his claim is without support in the law. *See People v. Flaherty*, 418 N.W.2d 695, 699-700 (Mich. Ct. App. 1987) (rejecting more general diminished capacity defense that long-term alcoholism affected defendant's ability to appreciate full consequences of actions).  Petitioner was entitled only to receive a voluntary intoxication instruction, and he received one.  As a result, Petitioner's assertion that counsel failed to obtain an expert to support some alternate diminished capacity defense is without merit.  Further, because no toxicological evidence was obtained or presented at trial, no factual basis existed for hiring a toxicologist to testify to Petitioner's condition. *Cf. Combs*, 205 F.3d at 287-88 (holding that decision to use clinical psychologist to testify to petitioner's intoxication was itself ineffective assistance of counsel where psychologist testified that, in his opinion, petitioner had the capacity to form the requisite intent).

Similarly, Petitioner's assertions that counsel improperly failed to file a notice of intent to introduce an insanity defense and failed to obtain a psychiatric evaluation for competency are unsupported.  Petitioner points to no record evidence casting doubt upon his sanity or competency, and he does not even argue that he was insane at the time he killed Graves.  Indeed, he does not now claim that he was either insane at the time of the murder or incompetent to stand trial.

- 29 -

He therefore fails to demonstrate any error by counsel in failing to seek an examination or failing to raise the defense at trial.

In sum, Petitioner's claim of ineffective assistance of trial counsel is without merit.

IV.    Ineffective Assistance of Appellate Counsel

In his final ground for relief, Petitioner claims that appellate counsel was ineffective for failing to raise on appeal the issues concerning the trial counsel's failures to object to the intoxication instruction, to file a notice of intent to pursue and insanity defense, to seek a competency examination and to obtain a toxicological expert.  An appellant has no constitutional right to have every non-frivolous issue raised on appeal.  "'[W]innowing out weaker arguments on appeal and focusing on 'those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  *Strickland*, 466 U.S. at 688.  As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another.  *Smith v. Robbins*, 528 U.S. 259, 289 (2002).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present."  *Id.* at 289.

In the instant case, as I previously have discussed, trial counsel did not render ineffective assistance in any of the ways suggested by Petitioner.  As a consequence, appellate counsel committed no error in failing to raise the claims on direct appeal.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date:  July 29, 2005                             _/s/ Ellen S. Carmody_____
                                                 ELLEN S. CARMODY
                                                 United States Magistrate Judge



**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).